## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| REBECCA A. KERLIN, WILLIAM B. SHIPLEY, MICHELLE GALE, KATHERINE WUTHRICH, and CLAIRE TOBIN, Individually, and NINA MARIE, Individually, and On Behalf of All Similarly Situated Persons | ) ) ) ) ) ) | Case No. 16 CV 7424 Judge Robert Blakey |
| **Plaintiffs** | ) ) | **Magistrate Judge Rowland** |
| **v.** | ) ) | **JURY TRIAL** |
| CHICAGO BOARD OF ELECTIONS, and JAMES M. SCANLON, Individually, and as General Counsel of the CHICAGO BOARD OF ELECTIONS, | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

NOW COME, the Plaintiffs, REBECCA A. KERLIN, WILLIAM B. SHIPLEY, MICHELLE GALE, KATHERINE WUTHRICH, and CLAIRE TOBIN, Individually, and NINA MARIE, Individually, and on Behalf of All Similarly Situated Persons, by and through their attorneys, Gregory E. Kulis & Associates, Ltd., and complaining against the Defendants, the CHICAGO BOARD OF ELECTIONS and JAMES M. SCANLON, JAMES M. SCANLON, Individually, and as General Counsel of the CHICAGO BOARD OF ELECTIONS, states as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to adjudicate this case pursuant to both 28 U.S.C. §1331, because it arises under the United States Constitution, and 28 U.S.C. §1343, because Plaintiffs seek relief under 42 U.S.C. §1983. This Court also has the authority under 28 U.S.C. §§2201 and 2202 to grant declaratory relief and other relief based thereon.

1

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391 and 1392 because Defendants are located within this judicial district and events giving rise to this action took place in this judicial district

## PARTIES

**Plaintiff Election Monitors**

3.     Plaintiff REBECCA A. KERLIN ("Kerlin") is a United States citizen and a resident of the City of Chicago. She brings this claim on her own behalf seeking redress for the Constitutional injuries in the manner that will be described herein. At all times relevant hereto, Kerlin was provided with credentials from a qualified civic organization to observe and monitor the statutory 5% "audits" of votes cast via Direct Recording Electronic Voting Systems machines pursuant to Illinois statute (*see* 10 ILCS 5/24C-15) from the March 15, 2016 Illinois Primary Election. As will be described in greater detail herein, said statutory "audit" occurred from March 23, 2016 through March 29, 2016 at Defendant CHICAGO BOARD OF ELECTIONS' storage facility, located at 1869 W. Pershing Rd., Chicago, Illinois 60609 and this Plaintiff was present for some or all of said statutory "audit." Furthermore, Kerlin intends on obtaining credentials through a qualified civic organization to observe and monitor the election night results as well as the statutorily-mandated "audits" of electronic voting results in the November 2016 General Election and again thereafter.

4.     Plaintiff WILLIAM B. SHIPLEY ("Shipley") is a United States citizen and a resident of the City of Chicago. He brings this claim on his own behalf seeking redress for the Constitutional injuries in the manner that will be described herein. At all times relevant hereto, Shipley was provided with credentials from a qualified civic organization to observe and monitor the statutory 5% "audits" of votes cast via Direct Recording Electronic Voting Systems machines

pursuant to Illinois statute (*see* 10 ILCS 5/24C-15) from the March 15, 2016 Illinois Primary Election. As will be described in greater detail herein, said statutory "audit" occurred from March 23, 2016 through March 29, 2016 at Defendant CHICAGO BOARD OF ELECTIONS' storage facility, located at 1869 W. Pershing Rd., Chicago, Illinois 60609 and this Plaintiff was present for some or all of said statutory "audit." Furthermore, Shipley intends on obtaining credentials through a qualified civic organization to observe and monitor the election night results as well as the statutorily-mandated "audits" of electronic voting results in the November 2016 General Election and again thereafter.

5.     Plaintiff MICHELLE GALE ("Gale") is a United States citizen and a resident of the Village of Glendale Heights, Illinois. She brings this claim on her own behalf seeking redress for the Constitutional injuries in the manner that will be described herein. At all times relevant hereto, Gale was provided with credentials from a qualified civic organization to observe and monitor the statutory 5% "audits" of votes cast via Direct Recording Electronic Voting Systems machines pursuant to Illinois statute (*see* 10 ILCS 5/24C-15) from the March 15, 2016 Illinois Primary Election. As will be described in greater detail herein, said statutory "audit" occurred from March 23, 2016 through March 29, 2016 at Defendant CHICAGO BOARD OF ELECTIONS' storage facility, located at 1869 W. Pershing Rd., Chicago, Illinois 60609 and this Plaintiff was present for some or all of said statutory "audit." Furthermore, Gale intends on obtaining credentials through a qualified civic organization to observe and monitor the election night results as well as the statutorily-mandated "audits" of electronic voting results in the November 2016 General Election and again thereafter.

6.     Plaintiff KATHERINE WUTHRICH ("Wuthrich") is a United States citizen and a resident of the City of Chicago. She brings this claim on her own behalf seeking redress for the

Constitutional injuries in the manner that will be described herein. At all times relevant hereto, Wuthrich was provided with credentials from a qualified civic organization to observe and monitor the statutory 5% "audits" of votes cast via Direct Recording Electronic Voting Systems machines pursuant to Illinois statute (*see* 10 ILCS 5/24C-15) from the March 15, 2016 Illinois Primary Election. As will be described in greater detail herein, said statutory "audit" occurred from March 23, 2016 through March 29, 2016 at Defendant CHICAGO BOARD OF ELECTIONS' storage facility, located at 1869 W. Pershing Rd., Chicago, Illinois 60609 and this Plaintiff was present for some or all of said statutory "audit." Furthermore, Wuthrich intends on obtaining credentials through a qualified civic organization to observe and monitor the election night results as well as the statutorily-mandated "audits" of electronic voting results in the November 2016 General Election and again thereafter.

7.     Plaintiff CLAIRE TOBIN ("Tobin") is a United States citizen and a resident of the City of Chicago. She brings this claim on her own behalf seeking redress for the Constitutional injuries in the manner that will be described herein. At all times relevant hereto, Tobin was provided with credentials from a qualified civic organization to observe and monitor the statutory 5% "audits" of votes cast via Direct Recording Electronic Voting Systems machines pursuant to Illinois statute (*see* 10 ILCS 5/24C-15) from the March 15, 2016 Illinois Primary Election. As will be described in greater detail herein, said statutory "audit" occurred from March 23, 2016 through March 29, 2016 at Defendant CHICAGO BOARD OF ELECTIONS' storage facility, located at 1869 W. Pershing Rd., Chicago, Illinois 60609 and this Plaintiff was present for some or all of said statutory "audit." Furthermore, Tobin intends on obtaining credentials through a qualified civic organization to observe and monitor the election night

results as well as the statutorily-mandated "audits" of electronic voting results in the November 2016 General Election and again thereafter.

8.      These individuals may be referenced collectively throughout the remainder of this pleading as the "Plaintiff Monitors."

**Plaintiff Voters**

9.      Plaintiff NINA MARIE ("Marie") is a United States citizen and resident of Cook County, Illinois. On March 15, 2016, she cast her vote in the 2016 Illinois Primary Election at an early voting site in Downtown Chicago and, in so doing, used a Direct Recording Electronic Voting Systems machine to cast her votes electronically. The electronic voting machine she used to cast her vote was amongst the Direct Recording Electronic Voting Systems machines that were "audited" pursuant to Illinois statute (*see* 10 ILCS 5/24C-15) at the location that was observed by the Plaintiff Monitors and as such, was subject to the misconduct complained of herein. She brings this cause of action individually and on behalf of a putative class consisting of all persons that cast their ballots electronically as part of the early voting program at the Downtown Chicago location in the March 15, 2016 Illinois Primary Election.

10.      Plaintiffs also seek certification of a putative class consisting of all persons that cast their ballots electronically as part of the early voting program at the Downtown Chicago location in the March 15, 2016 Illinois Primary Election (referenced collectively throughout the remainder of this pleading as the "Plaintiff Voters"). As will be described herein, the Plaintiff Monitors observed a pervasive and widespread pattern during the statutory 5% "audit" of the Direct Recording Electronic Voting Systems of individuals acting on behalf of Defendant CHICAGO BOARD OF ELECTIONS discarding votes, changing votes to meet a preordained tally, and other similar tactics that had the effect of depriving individuals who voted using said

Direct Recording Electronic Voting Systems machines of their Constitutionally-protected rights to vote for candidates of their choosing.

11.     As such, class certification is proper pursuant to Fed. R. Civ. P. 23 because the legal and factual allegations amongst these voters will be the same or sufficiently similar and typical – i.e. that the actions of the CHICAGO BOARD OF ELECTIONS as will be described herein deprived them of the right to vote for the candidates of their choosing. Furthermore, as this class will encompass all voters that availed themselves of the Direct Recording Electronic Voting Systems early voting machines at the Downtown Chicago polling location, the putative class numbers in the thousands and joinder is therefore impractical. Likewise, Plaintiff Marie will dutifully and adequately represent the interests of the individual voters comprising this class.

**Defendants**

12.     Defendant CHICAGO BOARD OF ELECTIONS ("BOE") is the local entity charged with statutory responsibility for conducting and overseeing elections in the City of Chicago (including, but not limited to, the March 15, 2016 Illinois Primary Election). Its statutory function and responsibilities include, but are not limited to, collecting and counting votes and canvassing and proclaiming the official election returns from the City of Chicago in a manner consistent with the Illinois Election Code, 10 ILCS 5/1, *et. seq*. As such, at all times relevant hereto and in committing the acts and omissions complained of herein, the BOE was acting under color of state law by and through its agents, servants, employees, and/or other persons it authorized to act on its behalf.

13.     Defendant JAMES SCANLON ("Scanlon") was, at all times relevant hereto, the General Counsel for the Chicago Board of Elections. He is sued in both his individual and

6

official capacities and, as explained herein, personally took part in some or all of the acts complained of herein.

## COMMON FACTS

14.     The Illinois Election Code authorizes the use of Direct Recording Electronic Voting Systems, approved by the State Board of Elections, permitting votes to be cast "by means of a ballot display provided with mechanical or electro-optical devices that can be activated by the voters to mark their choices for the candidates of their preference and for or against public questions." *See* 10 ILCS 5/24C-1. Said machines are ostensibly capable of instantly recording and storing the votes cast, as well as both tabulating the votes at the applicable precinct and producing a permanent paper record thereof (the "paper tape"). *Id.* The Illinois Election Code also authorizes jurisdictions to use such Direct Recording Electronic Voting Systems for individuals participating in early voting. *See* 10 ILCS 5/19A-25.5.

15.     As the use of electronic voting equipment has increased, so too has a certain degree of public skepticism and mistrust of the accuracy of such electronic voting machines, in particular with respect to elections to federal office. In part to address such concerns by ensuring the accuracy of the counts generated by the Direct Recording Electronic Voting Systems, and, specifically, to ensure said voting systems (electronic and otherwise) properly received, recorded, and tabulated in equal measure all voters' votes properly cast during elections using said voting systems, the Illinois Election Code requires the applicable election authority, *inter alia*, to "test the voting devices and equipment in 5% of the precincts within the election jurisdiction, as well as 5% of the voting devices used in early voting." *See* 10 ILCS 5/24C-15. The voting devices subject to this audit are to be selected at random after Election Day by the

State Board of Elections according to a method which ensures that every precinct and every voting device used in early voting has an equal mathematical chance of being selected. *Id.*

16.     With respect to said "test" of the voting machines, the Illinois Election Code provides that prior to proclaiming the election returns, the following procedure is to be followed:

> The test shall be conducted by counting the votes marked on the permanent paper record of each ballot cast in the tested precinct printed by the voting system at the time that each ballot was cast and comparing the results of this count with the results shown by the certificate of results prepared by the Direct Recording Electronic Voting System in the test precinct. The election authority shall test count these votes either by hand or by using an automatic tabulating device other than a Direct Recording Electronic voting device that has been approved by the State Board of Elections for that purpose and tested before use to ensure accuracy. The election authority shall print the results of each test count. If any error is detected, the cause shall be determined and corrected, and an errorless count shall be made prior to the official canvass and proclamation of election results. *If an errorless count cannot be conducted and there continues to be difference in vote results between the certificate of results produced by the Direct Recording Electronic Voting System and the count of the permanent paper records or if an error was detected and corrected, the election authority* **shall** *immediately prepare and forward to the appropriate canvassing board a written report explaining the results of the test and any errors encountered* and the report shall be made available for public inspection.

*See* 10 ILCS 5/24C-15 (emphasis added).

17.     To further ensure the accuracy and transparency of this essential process, the statutory scheme requires that written notice be provided prior to the 5% "test" and that representatives of the "State Board of Elections, the State's Attorney and other appropriate law enforcement agencies, the county chairman of each established political party and qualified civic organizations" be permitted to attend. *See* 10 ILCS 5/24C-15.

18.     From March 23, 2016 through March 29, 2016, Defendant BOE held what was purported to be the 5% "test count" as called for in the aforementioned statutory scheme at its storage facility, located at 1869 W. Pershing Rd., Chicago, Illinois 60609.

19.    On each of said dates, one or more of the Plaintiff Monitors attended the aforementioned 5% test of the voting machines at issue and attempted to observe and monitor the recount the BOE conducted, as was their right as credentialed members of civic organizations as provided for in the aforementioned statutory "test count" scheme.

20.    The "test count" was conducted by Defendants in a manner whereby one BOE employee would read aloud the individual count of votes as recorded on the "paper tape" results of a particular voter's ballot, while another BOE employee would generate a written record of that oral vote count on a tally sheet. These BOE tally sheets, however, already had the results of the previously-reported final vote count generated by the voting machines (presumably on Election Day or shortly thereafter) printed in bold adjacent to the space provided to tabulate the results as read orally from the "paper tape" results.  The BOE employees tabulated the results of the test count in pencil to allow for erasures by BOE employees both during their written tabulation of the oral "test count" and in reviewing the concordance of this tabulation with the "official" final vote count previously printed on the tabulation sheet for each candidate in each election for all municipal, state, and federal offices.

21.    On each of said dates, one or more of the Plaintiff Monitors attempting to monitor the "test" recounts observed numerous BOE employees miss a significant number of votes for their tabulations.

22.    On each of said dates, one or more of the Plaintiff Monitors attempting to monitor the "test" recounts observed numerous BOE employees tabulate vote totals that departed significantly from the "official" results generated by the voting machines.

23.    Instead of undertaking the steps required by statute – to produce a written report recording the fact of discrepancies between the "official" results from the voting machines and

9

the hand-tallied results as read from the "paper tape," and/or undertake other measures to investigate and determine the nature and cause of the errors and discrepancies – the BOE employees tallying the "paper tape" results simply changed the final tally numbers to match the "official" results already printed on the tally sheets provided to the BOE employees by the BOE, rather than the vote count as evidenced by the oral "test count" conducted by BOE employees as read from the paper tape.

24.     Based upon the Plaintiff Monitors' observations, and upon further information and belief, whenever a BOE employee's written tabulation reflected a discrepancy in the test count between the oral count read from the paper tape, and the "official" count printed on the written record of the audit produced by the BOE, BOE employees resolved such discrepancies in favor of the "official" pre-printed count, proffered in their final report to the Board (and the public) as correct, while simultaneously failing to report or record the fact of this discrepancy in the same report, as required by the state election code.  Upon further information and belief, such discrepancies and improprieties were widespread and pervasive throughout the "test counts" for said electronic voting machine results from the March 15, 2016 primary election.

25.     To compound matters, the BOE employees participating in the "test count" took active measures to hinder or outright prevent the Plaintiff Monitors from monitoring and documenting the aforementioned discrepancies and improprieties as they took place – including, but not limited to, bending or obscuring their tally sheets in a manner to shield them from the Plaintiff Monitors' view, physically obstructing the Plaintiff Monitors from viewing the individual performing the tallies, preventing these Plaintiffs from photographing or otherwise documenting the results of the tally sheets until the aforementioned discrepancies between the oral count from the paper tape, and the vote totals printed on the tally sheet, had been resolved

with their "final" count (i.e. their reconciliation of the result of the tabulated record of the oral vote count and the "official" count printed on their test count tabulation sheet), and other deliberate concerted efforts to prevent the Monitors from participating and monitoring the "test counts." As a result, the final audit of the vote totals did not include all voters whose ballots were properly cast, as evidenced by the record of said votes on the paper tape recorded by the election machines.

26. The Plaintiff Monitors questioned these actions, in some cases directly to the BOE employees participating in the "test counts" as they took place, to their respective supervisors on-site, and to the Commissioners of the Chicago Board of Elections shortly thereafter (and prior to the proclamation certifying the election). Both during the test count and subsequently, BOE personnel responded with hostility, refusing to either acknowledge or correct any of the aforementioned improprieties and discrepancies, and even going so far in multiple instances to inform the Plaintiff Monitors that they had conferred with, and been instructed to respond in this manner by, Defendant SCANLON himself.

27. Due to these improprieties and discrepancies, and also Defendants' failure to acknowledge or correct same during the March 23-29 "test counts," several of the Plaintiff Monitors appeared at the April 5, 2016 BOE meeting for the consideration of returns and proclamation of the results of the March 15 local, state, and federal primary elections, intending to participate by bringing the aforementioned observations to the BOE commissioners' attention prior to certification of the primary results. Despite the fact that this was an open meeting purportedly subject to public comment, one or more of the BOE commissioners prevented the Plaintiff Monitors from presenting evidence of these observed irregularities, or any public comment, prior to moving to certify the returns. Public comment was closed, the returns were

certified, and the proclamation meeting was adjourned all in less than *two minutes*. Plaintiff Monitors were given only obtuse, perfunctory information as to when they could not speak and were not informed of their eligibility to offer comment during the "discussion" period summarily called in advance of the motions to pass the final proclamation certifying the voting result notwithstanding the irregularities that Plaintiff Monitors submitted in writing in advance of the public meeting, and the express purpose for which they had signed in and requested the right to speak and present evidence at variance with the BOE's report of its retabulation.

## <u>COUNT I – VIOLATION OF THE RIGHT TO VOTE</u>
**Plaintiff Nina Marie, Individually, and on behalf of the "Plaintiff Voters" putative class**

28.     Plaintiffs incorporate Paragraphs 1-27 by reference as though fully set forth herein.

29.     As stated, the Plaintiff Voters were individuals that participated in early voting at the Downtown Chicago polling location and, in so doing, made use of the Direct Recording Electronic Voting System equipment described herein to cast their votes.

30.     As stated, the Plaintiff Monitors observed BOE employees fail to count or fail to tabulate numerous votes and/or alter the final tabulated vote count in the hand-tallied "paper tape" results of particular voter's ballot so that the recount totals would equal the "official" results generated by the voting machines.

31.     In order to manipulate the hand-tallied results to match the "official" results generated by the electronic voting machines, the BOE employees, in some instances, changed voters' votes from one candidate to another, added or subtracted tallies from one candidate or another, and/or simply stopped counting voters' ballots once they reached the numbers from the "official" results, printed in bold in the corner of the "cheat sheet."

12

32. Plaintiff Monitors have reason to believe that what they observed was not an isolated incident. Upon information and belief, the discrepancies between the "paper tape" results and the "official" results from the voting machines observed by the Plaintiff Monitors is not confined to a single precinct and may be part and parcel of a broader trend of inconsistencies in "official" results generated by Direct Recording Electronic Voting Systems, in this election and previous elections.

33. Likewise, the Plaintiff Monitors observed numerous different BOE employees employ different stratagems to achieve the same result, namely, resolving any discrepancy between the tabulation of the oral count from the paper tape record, and the "official" count printed on the tabulation sheet, in favor of the latter, regardless of the size or nature of the discrepancy or its potential impact on the election result. Because the conduct was not isolated to one or a few employees, but rather was pervasive and widespread, as previously discussed herein, the misconduct was the result of the BOE's *de facto* policy, practice, and procedure of willfully disregarding citizens' rights to vote, or acting with reckless disregard for the natural and probable consequences of their employees' actions.

34. The ultimate effect of these actions was to disenfranchise and deprive the Plaintiff Voters whose votes were changed, discarded, or otherwise altered, of their fundamental right to cast a vote for the candidates of their choosing, to have said votes properly counted, and to participate in the electoral process, and to have the people's relative and aggregate choices for federal office-holders – as evidenced by their recorded votes – be properly reflected in the official result solemnized by those officials tasked by law with doing so.

35. Further, these Plaintiff Voters were denied the protection of ensuring the proper tabulation of their ballots as votes, as is one of the stated purposes behind the Illinois Election Code with respect to said electronic voting machines – specifically, that the machines:

> will register correctly by means of exact counters every vote cast for the regular tickets thereon; […] that all votes cast on the machine on a regular ballot or ballots shall be registered […] that the machine is so constructed that the candidates for presidential electors of any party can be voted for only by voting for the ballot label containing a bracket within which are the names of the candidates for President and Vice-President of the party or group; that the machine is provided with a lock or locks by the use of which any movement of the voting or registering mechanism is absolutely prevented so that it cannot be tampered with or manipulated for any purpose; that the machine is susceptible of being closed during the progress of the voting so that no person can see or know the number of votes registered for any candidate.

*See* 10 ILCS 5/24-1.

36. Irrespective of whether their actions did or did not constitute a proper "audit" within the meaning of the Illinois Election Code, the Defendants refused to count the votes of certain Plaintiffs and changed the votes of others from one candidate to another. This conduct deprived said Plaintiffs of their right to vote and have their votes counted.

37. These aforementioned acts and/or omissions by Defendants were intentional, willful, and wanton.

38. Defendants knew that refusing to count votes and changing votes from one candidate to another would impair these citizens' rights to vote and still continued with said conduct in spite of such knowledge. Additionally, Defendants took deliberate advantage of procedures intended to preserve the secrecy of the vote to obfuscate and disregard any discrepancies between individual voters' votes properly cast, as reflected in the paper tape, and the official count produced by the voting machines and provided to the auditors in advance.

39. Defendants therefore acted with the intent to interfere with the electoral process and/or the Plaintiffs' rights to vote, or at least willfully disregarded the substantial certainty that

their actions would cause an unjustified interference with the electoral process and/or the Plaintiffs' rights to vote in federal elections.

40.     The foregoing conduct likewise stems from the BOE's customs, practices, and policies. In multiple prior elections, one or more of the Plaintiff Monitors herein has attempted to serve as an election monitor of the 5% audit. They have observed irregularities similar to those described herein and, upon information and belief, the irregularities have been addressed similarly – in particular, changing hand-counted tally amounts to match "official" returns.

41.     The BOE has knowledge of this practice and has taken no steps to remedy or even acknowledge it. The BOE's failure thus amounts to a *de facto* official policy of ignoring discrepancies between "official" machine-generated returns and hand-counted retabulations and always certifying the "official" retuns. As this necessarily requires either discounting or changing votes, this has the effect of amounting to a policy of depriving voters of the right to vote and have their votes counted.

42.     Defendant SCANLON is also personally liable, in that he took an active role in directing the BOE employees in committing the misconduct complained of herein. At all times relevant hereto, Defendant SCANLON was made aware of the events described herein as they unfolded and he voluntarily undertook an active role in directing the BOE employees in how to conduct the retabulation and how to respond to complaints raised by the Plaintiff Monitors.

43.     Additionally, Defendant SCANLON personally interacted with some of the Plaintiff Monitors and other persons attempting to monitor and observe the 5% "audit" discussed herein. Scanlon took active steps to deceive and/or impede these individuals from monitoring the audit, in spite of these individuals informing him of the irregularities and/or misconduct described herein.

44.     The aforementioned acts and/or omissions by Defendants were in violation of the Plaintiffs' equal protection and substantive due process rights as protected by 42 U.S.C. §1983.

45.     In particular, Defendants, while acting under color of state law, are administering an election process and protocol that deprives voters in the City of Chicago, including the individually-named and putative class of Plaintiff Voters herein, of their liberty interest in voting. The statutory "audit" provisions as provided for in the Illinois Election Code were intended to safeguard the right to vote by ensuring the accuracy of the Direct Electronic Voting Equipment and, in the event of an inaccuracy, to examine and potentially resolve errors and hence, to ensure Plaintiff Voters the right to vote and have their votes counted. Not only do the actions of the Defendants as complained of herein fail to ensure the rights of the Plaintiff Voters to vote, they compound this problem through the faulty and improper "audit," insofar as the actions taken and procedures prescribed create an unreasonable risk that a voter's vote may not only go uncounted due to an error in the electronic voting equipment, but may actually be switched from one candidate to another in order to match the "tally" counts to the "official" returns. As such, this conduct amounts to a willful interference with these Plaintiffs' right to vote irrespective of whether it comports with the Illinois Election Code. Therefore, unless enjoined by this Court, Plaintiff Voters will continue to suffer irreparable harm, damage, and injury for which there is no adequate remedy at law.

### COUNT II – VIOLATION OF FREEDOM OF ASSOCIATION AND TO PETITION THE GOVERNMENT
#### Each of the Individually-Named "Plaintiff Monitors"

46.     Plaintiffs incorporate Paragraphs 1-27 by reference as though fully set forth herein.

16

47.     As stated, the Plaintiff Monitors were credentialed election observers and were well within their statutory rights to observe and monitor the "test counts" of the voting machines recording Illinois state primary election ballots on Election Day and during Early Voting, and ensure that the intent of the voters is collectively and accurately reflected in any and all tabulations of votes and review of ballots, whether cast electronically or otherwise.

48.     Defendants committed acts that were improper and/or hostile to the Plaintiff Monitors and their rights of association, participation, and to band together for the advancement of political beliefs in one or more of the following ways:

a. Physically obstructing the Plaintiff Monitors from viewing the individual performing the tallies,

b. Preventing the Plaintiff Monitors from photographing or otherwise documenting the results of the tally sheets,

c. Individuals performing the tallies bending or obscuring their tally sheets in a manner to shield them from the Plaintiff Monitors' view,

d. Making hostile comments when the Plaintiff Monitors requested that they cease the foregoing activities and refusing to acknowledge or correct any of the aforementioned improprieties and discrepancies;

e. Deliberately misleading the Plaintiff Monitors that appeared at the April 5, 2016 BOE meeting for the consideration of returns and proclamation of the results of the March 15 primary and preventing the Plaintiff Monitors from commenting prior to moving to certify the returns;

f. Swiftly bringing the certification of the results to a vote and subsequent adjournment without permitting the Plaintiff Monitors the opportunity to object to, or publically comment on, the procedures at the 5% "test counts" – despite the fact that they knew these Plaintiffs had attended the public meeting for this very purpose and had just told them they would not be able to speak seconds earlier; and

g. Otherwise attempted to hinder or impede the Plaintiff Monitors' ability to monitor the 5% "test counts" as authorized by statute.

49.     The cumulative effect of said acts and/or omissions was to deny these Plaintiffs their freedom to associate with other individuals and to petition the BOE with respect to the

aforementioned discrepancies and improprieties observed during the 5% "test counts" of the voting machine ballots.

50.     The aforementioned acts and/or omissions by Defendants were intentional, willful, and wanton.

51.     The aforementioned acts and/or omissions by Defendants were in violation of the Plaintiffs' First and Fourteenth Amendment rights as protected by 42 U.S.C. §1983.

Unless enjoined by this Court, Plaintiffs REBECCA A. KERLIN, WILLIAM B. SHIPLEY, MICHELLE GALE, KATHERINE WUTHRICH, and CLAIRE TOBIN will continue to suffer irreparable harm, damage, and injury for which there is no adequate remedy at law.**COUNT III –DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**All Plaintiffs**

52.     Plaintiffs incorporate Paragraphs 1-27 by reference as though fully set forth herein.

53.     As previously discussed herein, the Illinois Election Code dictates that the "test count" procedure shall be conducted "[p]rior to the proclamation" of the election returns. 10 ILCS 5/24C-15.

54.     As previously discussed herein, the "test count" procedures with respect to the Direct Recording Electronic Voting Systems mandates that, in the event that an errorless count cannot be obtained or an error detected, the election authority (i.e. Defendants herein) "*shall* immediately prepare and forward to the appropriate canvassing board a written report explaining the results of the test and any errors encountered and the report shall be made available for public inspection." *See* 10 ILCS 5/24C-15 (emphasis added).

55.     As previously discussed herein, even if the cause of an error or discrepancy is determined and corrected, the local election authority is still required to document the errors and/or discrepancies in a written report to be submitted to the State Board of Elections. *Id.*

56.     Defendants herein did not prepare and forward the written report explaining the errors and/or discrepancies regarding the 5% audit, nor did they make an earnest attempt to acknowledge, determine, or correct the error(s) giving rise to the aforementioned discrepancies. Rather, the BOE simply changed the numbers on the hand-tallies to match the "official" totals.

57.     The statute does not permit an election authority such as the BOE to skirt its statutory reporting requirements by changing the numbers to meet the official tally, acting as though the error or omission did not exist.

58.     The statute does not permit an election authority such as the BOE to achieve an "errorless count" within the meaning of the aforementioned statutes by changing the numbers to meet the official tally.

59.     To the contrary, the statute provides that "[i]f _any_ error is detected, the cause _shall_ be determined and corrected, and an errorless count _shall_ be made _prior to_ the official canvass and proclamation of election results." *See* 10 ILCS 5/24C-15 (emphasis added).

60.     Because the BOE employees did not acknowledge and report any of the clear errors and/or discrepancies that arose during the audit, it was in error and in violation of the Illinois Election Code for the BOE to officially canvass and proclaim the election results.

61.     Because the BOE employees did not identify any of the clear errors and/or discrepancies that arose during the audit (and, hence, did not determine or correct the cause thereof), it was in error and in violation of the Illinois Election Code for the BOE to officially canvass and proclaim the election results.

62.     Because the BOE employees did not achieve an "errorless count" or report same, it was in error and in violation of the Illinois Election Code for the BOE to officially canvass and proclaim the election results.

63.     Because the BOE employees' conduct as described herein so clearly and drastically departed from the expressed statutory requirements, the BOE did not perform a true "audit" within the meaning of 10 ILCS 5/24C-15.

64.     Although the BOE has failed to perform its statutorily-mandated determination of the accuracy of the Direct Recording Electronic Voting Systems, the statute itself is vague as to the remedies available in the event that a local election authority such as the BOE breaches the statute. As such, an actual, justiciable controversy exists between the parties regarding:

a.  Whether the BOE has performed a 5% "audit" of the applicable electronic voting machines as defined in the statute;

b.  Whether the practices described herein entitled the BOE to canvass and proclaim the primary election results;

c.  Whether the BOE had the authority to hinder or obstruct the credentialed Plaintiff Monitors from observing and documenting the 5% audit and also from hindering or obstructing the Plaintiff Monitors from objecting to the audit results prior to certification; and

d.  In the event that the BOE has not complied with the statute, what is the statutory and/or judicial remedy for same.

65.     This controversy produces uncertainty and insecurity with respect to the legal rights, liabilities, and relations of the parties, in that:

a.  The acts and misconduct observed by the Plaintiff Monitors necessarily means that a number of the Plaintiff voters were either not counted or were inaccurately counted;

b.  The Direct Recording Electronic Voting Systems did not accurately cast or record the votes of numerous Plaintiff voters;

c.  The Plaintiff voters intend to vote early in the upcoming November 2016 General Election and again thereafter and, as such, must therefore use the electronic voting equipment that may not accurately cast or record their votes;

d.  No diagnostic or corrective measures can be taken with respect to the inaccurate vote totals generated by the Direct Electronic Voting Systems at issue herein because the Defendants neither acknowledged nor reported such inaccuracies; and

20

     e.   The Plaintiff Monitors intend to serve as credentialed election Monitors in the upcoming November 2016 General Election and again thereafter and, as such, harbor concerns that their ability to do so will be hindered or obstructed and/or that the BOE will again ignore their complaints of inaccuracies with the electronic voting equipment.

66.    The aforementioned uncertainty and insecurity existing with regard to the legal rights, liabilities and relations of the parties can only be resolved by a judicial declaration, and an actual controversy presently exists by and between the parties.

67.    Because the BOE has disregarded the statutorily-mandated mechanism to ensure that votes are properly tabulated and not miscounted, discarded, or outright changed, no adequate remedy exists at law for the Plaintiff voters to redress the wrongs claimed herein.

68.    As previously discussed herein, the Plaintiff Monitors were rebuffed and rejected in their attempts to protest these irregularities to the BOE prior to the Board officially canvassing and certifying the election results, thus depriving them of the opportunity to resolve the discrepancies. The foregoing further demonstrates that no adequate remedy exists at law.

69.    Because the Plaintiff Voters' votes were not accurately tabulated or recorded by the Direct Recording Electronic Voting Systems, and because the BOE has failed and refused to acknowledge, report, or remedy such inaccuracies, it is reasonably certain that the inaccuracies will persist in the November 2016 General Election and again thereafter. The Plaintiffs have therefore suffered irreparable harm due to their votes being miscounted or outright changed, and will continue to suffer such harm in further elections unless the BOE is enjoined by this Court.

70.    Said irreparable harm outweighs any potential harm to the BOE, as a ruling in Plaintiffs' favor granting injunctive relief will simply ensure that the BOE does not violate Plaintiffs' constitutionally-protected right to vote and will ensure that they comply with Illinois law.

71.     Because the BOE employees did not acknowledge and report any of the clear errors and/or discrepancies that arose during the audit, and for the reasons previously discussed herein, the Plaintiffs herein have a reasonable likelihood of success on the merits.

72.     Granting injunctive relief as requested herein will not harm the public interest – if anything, it will promote the public interest by ensuring and supporting the integrity of the electoral process and ensuring that all voters using Direct Electronic Voting Systems votes are counted and counted for the candidate of their choosing.

73.     The Defendants should be permanently enjoined from further violating the Illinois Election Code in the manner described herein.

### PRAYER FOR RELIEF AS TO ALL COUNTS

WHEREFORE, the Plaintiffs REBECCA A. KERLIN, WILLIAM B. SHIPLEY, MICHELLE GALE, KATHERINE WUTHRICH, and CLAIRE TOBIN, Individually, and NINA MARIE, Individually, and on Behalf of All Similarly Situated Persons respectfully request that the Court award the following relief:

I.    Certify the putative class proposed herein, consisting of all persons that cast their ballots electronically as part of the early voting program at the Downtown Chicago location in the March 15, 2016 Illinois Primary Election

II.   Issue Declaratory Judgments that:

   a. Defendant Chicago Board of Elections did not perform an audit to "test the voting devices and equipment in 5% of the precincts within the election jurisdiction, as well as 5% of the voting devices used in early voting" and has therefore violated Section 24C-15 of the Illinois Election Code;

   b. Defendant Chicago Board of Elections did not acknowledge and report the detected errors and/or discrepancies in the results of the Direct Recording Electronic Voting Systems and has therefore violated Section 24C-15 of the Illinois Election Code;

c. Defendant Chicago Board of Elections did not determine the cause of or correct the errors and/or discrepancies in the results of the Direct Recording Electronic Voting Systems and has therefore violated Section 24C-15 of the Illinois Election Code;

d. Defendant Chicago Board of Elections did not achieve an "errorless count" in the results of the Direct Recording Electronic Voting Systems and has therefore violated Section 24C-15 of the Illinois Election Code;

e. Defendant Chicago Board of Elections did not prepare and forward to the appropriate canvassing board a written report explaining the results of the test and any errors encountered the detected errors in the results of the Direct Recording Electronic Voting Systems and has therefore violated Section 24C-15 of the Illinois Election Code;

f. By changing the results of the "paper tape" retabulation results of a particular to match the "official" results generated by the Direct Recording Electronic Voting Systems, Defendant Chicago Board of Elections has violated Section 24C-15 of the Illinois Election Code;

a. Requires Defendant Chicago Board of Elections to make available for inspection the full "paper tape" results of the Direct Electronic Voting Systems that were "audited" in the manner described herein; and

g. Defendant Chicago Board of Elections, by and through its agents, servants, and/or employees conducting the March 23-29 statutory audit, has hindered, obstructed, and otherwise prevented the Plaintiff Monitors from observing and documenting the errors in the retabulations, and has therefore violated Section 24C-15 of the Illinois Election Code requiring that credentialed members of "qualified civic organizations" may be represented at the test.

III. Issue Preliminary and Permanent Injunctions that:

a. Enjoin Defendants from changing or altering any and all vote tallies generated by the "paper tape" record of votes from the Direct Recording Electronic Voting Systems when comparing same to the certificate of results prepared by the Direct Recording Electronic Voting System in any way, shape or form;

b. Enjoin Defendants from canvassing and proclaiming any and all election results wherein the recounted votes from the "paper tape" tallies have been changed or altered;

c. Enjoin Defendants from printing the vote totals from the certificate of results prepared by the Direct Recording Electronic Voting System on the tally sheets used to record the vote tallies generated by the "paper tape" record of votes;

d. Enjoin Defendants from failing to document and report any and all discrepancies between the vote tallies generated by the "paper tape" record of votes from the

Direct Recording Electronic and the certificate of results prepared by the Direct Recording Electronic Voting System;

e. Enjoin Defendants from in any way hindering credentialed members of "qualified civic organizations," as the term is used in the Illinois Election Code, from being present and observing or documenting the results of the election returns in the November 2016 General Election and further elections thereafter;

f. Enjoin Defendants from in any way hindering credentialed members of "qualified civic organizations," as the term is used in the Illinois Election Code, from being present and observing or documenting the results of the 5% audit of the electronic voting equipment referred to in the Illinois Election Code; and

g. Voids and rescinds the canvassing and proclamation of the results of the March 15 primary election returns that occurred at the April 5, 2016 Chicago Board of Elections meeting for the consideration of returns, as said proclamation occurred without first obtaining an "errorless count" as referenced in Section 24C-15 of the Illinois Election Code, and requiring the Chicago Board of Elections to conduct a 5% audit of the March 15 primary election returns consistent with the requirements of Section 24C-15.

IV. Award Compensatory Damages to the Plaintiff Monitors for violation of their Freedoms of Association and to Petition the Government pursuant to the First and Fourteenth Amendment rights as protected by 42 U.S.C. §1983.

V. Award Compensatory Damages to the Plaintiff Voters for violation of their fundamental right to vote and the Equal Protection of said rights pursuant to their Fourteenth Amendment rights as protected by 42 U.S.C. §1983.

VI. Award Plaintiffs their costs and reasonable attorneys' fees, pursuant to the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988.

VII. Grant such other and additional relief as the Court may deem just and proper

Respectfully submitted,
By: /s/ Gregory E. Kulis

Gregory E. Kulis
Joshua S. Patrick
Gregory E. Kulis & Associates, Ltd.
30 North LaSalle Street, Suite 2140
Chicago, Illinois 60602 / 312-580-1830

24