## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

REBECCA A. KERLIN, *et al.*,

      Plaintiffs,

      v.

CHICAGO BOARD OF ELECTIONS
and JAMES M. SCANLON,

      Defendants.

Case No. 16-cv-7424

Judge Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiffs Rebecca Kerlin, William Shipley, Michelle Gale, Katherine Wuthrich, and Claire Tobin (collectively, the "Plaintiff Monitors") served as election monitors in Chicago during the March 15, 2016 Illinois primary election. Plaintiff Nina Marie cast an electronic ballot in downtown Chicago during the election's early voting program.

On July 21, 2016, Plaintiffs filed suit in this Court seeking declaratory and injunctive relief against the Chicago Board of Elections ("BOE") and its General Counsel, James Scanlon ("Scanlon") (collectively, "Defendants"). Plaintiffs allege that Defendants' actions both during and after the election violated their right to vote (Count I) and their rights to freedom of association and to petition the government (Count II). On November 8, 2016, Defendants jointly moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Amended Complaint for failure to state a claim. Defs.' Mot. Dismiss [18]. For the reasons explained below, Defendants' motion is granted in part and denied in part.

I. **Background**

   A. **The Illinois Election Code and Direct Recording Electronic Voting Systems**

The Illinois Election Code authorizes election precincts to use Direct Recording Electronic Voting Systems ("Electronic Voting Systems") during both regular and early voting. 10 ILCS § 5/24C-1. When an Electronic Voting System is utilized, voters cast votes via an electronic ballot display "with mechanical or electro-optical devices that can be activated by the voters to mark their choices for the candidates of their preference and for or against public questions." *Id.* These voting devices are ostensibly capable of: (1) electronically recording and storing ballots; (2) tabulating votes; and (3) producing a permanent paper record for each ballot cast. *Id.*

After each voter completes his or her electronic ballot, the Electronic Voting System records an image of the completed ballot, and, upon request, prints the permanent paper record, which shows the votes cast in readable form. *Id.* at §§ 5/24C-2, 5/24C-12. The permanent paper record for each respective ballot contains a unique, randomly assigned identifying number that corresponds to the number randomly assigned by the voting system to each ballot as it is electronically recorded. *Id.* Permanent paper records are preserved and secured by election officials in the same manner as traditional paper ballots, and are available as an official record for any recount, redundant count, or verification or retabulation of the vote count. *Id.* at § 5/24C-12.

In addition to creating the permanent paper record, the Electronic Voting System also independently records each vote cast for or against any candidate and for or against any public question. *Id.* at § 5/24C-11(u). Upon the close of voting, these vote totals are tabulated by the Electronic Voting System and an "In-Precinct Totals Report" is generated for return to the election authority. *Id.* at § 5/24C-12. This report includes the total number of ballots cast for each candidate and public question and constitutes the official return of each precinct. *Id.* at § 5/24C-15.

To ensure the accuracy of the automatic counts generated by Electronic Voting Systems, the Illinois Election Code requires each election authority to, *inter alia*, test the voting devices and equipment in five percent of the precincts within each election jurisdiction, as well as five percent of the voting devices used in early voting. *Id.* These tests are conducted after Election Day, but prior to the proclamation of election results. *Id.*

The tests consist of counting individual votes recorded on the permanent paper record of each ballot and comparing the totals with the results tabulated by the Electronic Voting System. *Id.* If any error is detected, the Illinois Election Code requires the cause to be "determined and corrected," and an errorless count to be made before election results are officially canvassed and proclaimed. *Id.* Furthermore, if either: (1) an error is detected and corrected; or (2) an errorless count cannot be conducted because there continues to be a discrepancy between the count from the permanent paper records and the results produced by the Electronic Voting System, the election authority must "immediately prepare and forward to

the appropriate canvassing board a written report explaining the results of the test and any errors encountered." *Id.* This report must be made available for public inspection. *Id.*

By statute, advance written notice of the time and place of these tests must be provided to the State Board of Elections, the State's Attorney, appropriate law enforcement agencies, the county chairman of each established political party, and, of particular relevance here, "qualified civic organizations." *Id.* Representatives of these institutions are permitted to attend the tests. *Id.*

## B. Testing for the March 15, 2016 Illinois Primary Election

From March 23, 2016 through March 29, 2016, the Chicago BOE tested the required five percent of the Electronic Voting Systems used in the March 15, 2016 primary. Am. Compl. [17] ¶ 18. One or more of the Plaintiff Monitors were credentialed by a qualified civic organization to attend each test performed. *Id.* ¶ 19.

According to Plaintiffs, the BOE conducted the tests by having one BOE employee read aloud votes from the permanent paper record of individual ballots. *Id.* ¶ 20. Meanwhile, another BOE employee created a written tally sheet of the oral vote count. *Id.* Plaintiffs contend, however, that the total vote counts tabulated by the Electronic Voting System were printed on these tally sheets before the test count began. *Id.* Moreover, BOE employees tallied the oral vote count in pencil, allowing for erasures. *Id.* Plaintiffs allege that the combination of the pre-printed vote totals and the use of pencils allowed BOE employees to alter tallies

4

from the oral vote count so that they matched vote totals tabulated by the Electronic Voting System. *Id*.

Plaintiffs allege that, throughout the testing process, multiple BOE employees tallied oral vote totals that departed significantly from the results generated by the Electronic Voting Systems. *Id*. ¶ 22. BOE employees did not, however, undertake the steps required by statute (i.e. determine, correct, and report the error encountered). *Id*. ¶ 23. Instead, BOE employees intentionally altered tally numbers to match the results that had already been placed on the tally sheets, regardless of the oral vote count from the permanent paper record. *Id*. Specifically, BOE employees changed votes from one candidate to another, added or subtracted votes from candidates, and stopped counting votes once they reached the result that was pre-printed on the tally sheet. *Id*. ¶ 31. BOE employees then falsely reported that no inconsistencies were discovered. *Id*. Plaintiffs claim that these improprieties were pervasive throughout the "test counts" for Electronic Voting Systems from the March 15, 2016 primary election. *Id*. ¶ 24.

Additionally, Plaintiffs allege that BOE employees took active measures to "hinder or outright prevent" the Plaintiff Monitors from monitoring and recording the improprieties as they occurred. *Id*. ¶ 25. Plaintiffs claim, for example, that BOE employees physically obstructed the Plaintiff Monitors from observing employees perform the tests and prevented Plaintiffs from photographing or documenting the results of the tallies until any discrepancies were fraudulently "resolved." *Id*. Plaintiffs claim that when they challenged these actions, BOE

employees and their supervisors—including Scanlon—refused to acknowledge or correct any of the discrepancies. *Id.* ¶ 26.

Following the testing process, several of the Plaintiff Monitors attended an April 5, 2016 BOE meeting in order to notify BOE commissioners of Plaintiffs' observations before election results were certified. *Id.* ¶ 27. Plaintiffs claim that the gathering was supposed to be an open meeting subject to public comment. *Id.* Plaintiffs allege, however, that the BOE commissioners prevented the Plaintiff Monitors from presenting evidence of their observed irregularities. *Id.* Instead, the BOE immediately closed public comment, certified the election results, and adjourned the meeting in less than two minutes. *Id.*

## II.     Legal Standard

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). A motion to dismiss tests the sufficiency of a complaint, not the merits of a case. *Autry v. Northwest Premium Servs., Inc.,* 144 F.3d 1037, 1039 (7th Cir. 1998). To survive a motion to dismiss, a complaint must first provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice" of what the claim is "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Second, the complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, the allegations must raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs. Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). A claim has facial plausibility "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The "amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating the complaint, the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of Plaintiff. *Iqbal*, 556 U.S. at 678.

## III.   Analysis

### A.      Count I:  Violation of the Right to Vote

#### 1.      Count I States a Claim under 42 U.S.C. § 1983

In Count I, Plaintiffs allege under 42 U.S.C. § 1983 that Defendants' actions deprived voters of their fundamental right to vote. Am. Compl. [17] ¶¶ 34, 44. A plaintiff who seeks relief under § 1983 must establish that: (1) the alleged conduct was committed by a person acting under color of state law; and (2) this conduct

deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Griffin v. Roupas*, No. 02-cv-5270, 2003 WL 22232839, at *3 (N.D. Ill. Sept. 22, 2003), *aff'd*, 385 F.3d 1128 (7th Cir. 2004). Defendants assert that Plaintiffs' Amended Complaint fails the second prong of this test. *See* Defs.' Mot. Dismiss [18] 4-5. The Court disagrees.

The Supreme Court has long held that voting "is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi,* 504 U.S. 428, 433 (1992); *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). The "starting point" for the Court's analysis, therefore, "is a recognition that the Constitution protects the right of all qualified citizens to vote in state and federal elections, and to have their votes counted without debasement or dilution." *Hennings v. Grafton*, 523 F.2d 861, 863-64 (7th Cir. 1975) (citing *Reynolds v. Sims*, 377 U.S. 533, 554 (1964); *Hadley v. Junior College District of Metropolitan Kansas City*, 397 U.S. 50, 52 (1970)).

At the same time, the "very nature of the federal union contemplates separate functions for the states." *Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1272 (7th Cir. 1986). The Constitution "was intended to preserve to the States" the power to "establish and maintain their own separate and independent governments, except insofar as the Constitution itself commands otherwise." *Oregon v. Mitchell,* 400 U.S. 112, 124 (1970).

Thus, when a plaintiff "invokes § 1983 in federal court to challenge the conduct of a state or local election," courts "must balance the protection of the right

to vote enshrined in the First and Fourteenth Amendments with the avoidance of excessive entanglement of federal courts in state and local matters." *Parra v. Neal*, 614 F.3d 635, 637 (7th Cir. 2010), *as revised* (July 19, 2010).  If "every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss." *Bodine*, 788 F.2d at 1272.

In addition to harmonizing this principled tension, courts must remember the practical truth that elections "are generally conducted by volunteers, rather than trained professionals." *Id*.  For these volunteers, "whose experience and intelligence vary widely," and for whom the work of conducting elections "is at most an avocation," some "errors and irregularities" are inevitable.  *Id.*  Many such anomalies, which exhibit "widely differing degrees of severity," afford no constitutional recourse.  *Bodine*, 788 F.2d at 1272; *Hennings*, 523 F.2d at 865.  Rather, "state election laws must be relied upon to provide the proper remedy." *Hennings*, 523 F.2d at 865.

Accordingly, "not every election irregularity" will "give rise to a constitutional claim and an action under section 1983."  *Id.* at 864; *Barr v. Chatman*, 397 F.2d 515, 516 (7th Cir. 1968) ("[A] complaint brought under 42 U.S.C. § 1983, which alleges any voting irregularity, however slight, does not thereby automatically state a claim for relief.").  Rather, election irregularities implicate § 1983 "only when

9

defendants have engaged in *willful* conduct which undermines the organic processes by which candidates are elected." *Parra*, 614 F.3d at 637 (internal quotations omitted) (emphasis in original); *see also Kozuszek v. Brewer,* 546 F.3d 485, 488 (7th Cir. 2008); *Dieckhoff v. Severson*, 915 F.2d 1145, 1148 (7th Cir. 1990); *Kasper v. Bd. of Election Comm'rs,* 814 F.2d 332, 343 (7th Cir. 1987); *Bodine,* 788 F.2d at 1272. "Willful conduct" means, "at a minimum, that the defendants acted with the intent of subverting the electoral process or impairing a citizen's right to vote." *Parra*, 614 F.3d at 637.

The seminal Seventh Circuit cases on this issue best illustrate the above standard in light of the particular facts presented here. In *Hennings*, voters in Coles County, Illinois, alleged that malfunctioning electronic voting devices at multiple precincts inaccurately tabulated votes in the 1974 election for county offices. 523 F.2d at 862-63. In addition, the plaintiffs alleged that election officials failed to provide paper ballots as a substitute; failed to exercise proper supervisory oversight in checking access to the machines and preserving the results of the election; and refused to conduct a statutory retabulation to determine the cause of the discrepancies. *Id*. at 863. The plaintiffs claimed that, as a result of the misfeasance, they were deprived of their right to vote.

The Seventh Circuit affirmed judgment in favor of the defendants. The court found that, at most, the record showed "irregularities caused by mechanical or human error." *Id.* at 864. Equally important, such evidence lacked "invidious or fraudulent intent." *Id*. According to the court, "absent aggravating circumstances"

of fraud or other willful conduct, mere "[v]oting device malfunction, the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with, and the refusal of those officials after the election to conduct a retabulation," fell "far short of constitutional infractions." *Id.*

Over a decade after *Hennings*, the Seventh Circuit encountered a similar fact pattern in *Bodine*. *Bodine* challenged the use of a computerized voting system for the 1982 general election that electronically tabulated vote counts. *Id.* at 1271. Prior to the election, the clerk of the county election board did not verify the accuracy of computer program control cards or perform any tests to ensure the proper functioning of the system. *Id.* When election officials started the actual tabulation of votes, errors began to appear. *Id.* Multiple patchwork repairs (such as changing control cards) were conducted to correct the problems, but no comprehensive tests or evaluations were performed. *Id.* The plaintiffs, candidates for state and federal offices that ultimately lost their respective races, sued the clerk and the county election board, arguing that the absence of error-free computer testing undermined the legitimacy of the computerized vote count. *Id.* The district court granted summary judgment to the defendants, and the Seventh Circuit affirmed.

The Seventh Circuit stated that the plaintiffs "alleged nothing more than garden variety election irregularities that could have been adequately dealt with through the procedures set forth in Indiana law." *Id.* at 1272. At bottom, the

plaintiffs alleged that the defendants failed to "test, count, and certify in accord with Indiana law." *Id*. at 1273. Notably absent from the plaintiffs' theory was "any allegation that the computer control cards were somehow manipulated by the defendants" to alter vote totals and thus undermine the election. *Id*. at 1272-73. Rather, under the plaintiffs' facts, the defendants merely placed the control cards into the computerized voting system "with no knowledge of whether the program would produce error," and if so, "whether that error would be helpful to Republicans or helpful to Democrats." *Id*. According to the court, such evidence was "virtually indistinguishable from the facts of *Hennings*" and showed, at most, "incompetence," or "willful neglect." *Id*. Under § 1983, this is not enough.

Plaintiffs here allege, however, what those in *Hennings* and *Bodine* did not. Plaintiffs not only claim that the Electronic Voting System used during the March 15, 2016 primary election inaccurately tabulated votes, but that BOE employees affirmatively altered tally numbers derived from the permanent paper record so that the recount totals would match the electronic results. Am. Compl. [17] ¶ 30. This manipulation included adding or subtracting tallies from individual candidates, changing votes from one candidate to another, or stopping the recount process once the results matched the electronically tabulated vote totals, regardless of whether uncounted permanent paper record ballots remained. *Id*. ¶ 31. In addition, Plaintiffs allege that the same BOE employees took active measures to obstruct Plaintiff Monitors from monitoring and recording the improprieties as they occurred. *Id*. ¶ 25. Combined, such allegations go beyond the simple voting device

malfunction theories alleged in *Hennings*, or the "incompetence" and "willful neglect" shown in *Bodine*. Rather, Plaintiffs plausibly assert the very "invidious or fraudulent intent" and "manipulation" of vote totals deemed necessary by those decisions. As a result, Plaintiffs have sufficiently pled a cause of action under § 1983 at this early stage of the proceedings.

In response, Defendants claim that Plaintiffs' allegations stem from the Illinois state Election Code, and a violation of a state law does not state a claim under § 1983. Defs.' Mem. Supp. Mot. Dismiss [18] 4-5. Of course, "to invoke the jurisdiction of the federal courts and to be entitled to relief therefrom," Plaintiffs "must allege more than the mere failure of state officials to follow state law"; they must allege that Defendants "violated some federally protected or constitutionally guaranteed right." *Moore v. Kusper*, 465 F.2d 256, 258 (7th Cir. 1972). The two concepts, however, are not mutually exclusive; Plaintiffs may plausibly allege a violation of *both* state and federal regimes. So long as the latter is properly pled, it "is no answer" that "state law could provide the relief sought." *Hennings*, 523 F.2d at 864. As discussed above, Plaintiffs have adequately pled, in addition to violations of the Illinois Election Code, infringements of the right to vote under § 1983. Defendants' argument, therefore, is unpersuasive.

### 2.    **Count I States a *Monell* Claim**

Defendants alternatively argue that Count I fails to allege the existence of a policy or custom necessary to support municipal liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Defs.' Mot. Dismiss

[18] 7-9.  Although *Monell* subjects local governmental units to suit under 42 U.S.C. § 1983, *respondeat superior* will not suffice to impose liability.  *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).  The municipality's *policy*, not employees, must be the source of the discrimination.  *Id.*; *Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir. 1992) ("Municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents.").  Consequently, a § 1983 complaint against a municipality "must plead the existence of a custom or policy that was the direct cause of the deprivation of a federal right." *Caldwell v. City of Elmwood, Ind.*, 959 F.2d 670, 673 (7th Cir. 1992).  Specifically, Plaintiffs must plead factual content that would allow the Court to plausibly infer that: (1) they suffered the deprivation of a constitutional right; and (2) an official custom or policy caused that deprivation.  *Barwicks v. Dart*, No. 14-cv-8791, 2016 WL 3418570, at *2 (N.D. Ill. June 22, 2016).  Regarding the second element, Plaintiffs must plead that the constitutional violation was caused by: (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority.  *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011).

Once again, Defendants' argument fails.  A § 1983 municipal liability claim "need not meet any heightened pleading standard, but rather must simply set forth sufficient allegations to place the court and defendants on notice of the gravamen of the complaint."  *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,*

14

507 U.S. 163, 168 (1993). The Seventh Circuit explored the limits of this principle in *White v. City of Chicago*, 829 F.3d 837, 839 (7th Cir. 2016), *cert. denied sub nom.*, 137 S. Ct. 526 (2016). In *White*, following a two-year narcotics investigation, the defendant police officer applied for dozens of arrest warrants, including one for the plaintiff. *Id.* In a later civil suit, the plaintiff claimed that the officer failed to present the judge who issued the warrant with enough information to establish probable cause for the arrest. *Id.* The plaintiff also alleged a *Monell* claim against the City of Chicago for its supposed widespread practice of seeking arrest warrants upon the basis of conclusory complaint forms. *Id.* at 841. The district court originally held that the plaintiff failed to state a *Monell* claim because his complaint only stated that the officer who arrested him "acted in accordance with a widespread practice of the police department of the City of Chicago when seeking a warrant." *Id.* at 843. According to the district court, this conclusory statement was not enough "to draw the reasonable inference that the City maintained a policy, custom, or practice that deprived [the plaintiff] of his constitutional rights." *Id.*

The Seventh Circuit found the district court's ruling to be in error. *Id.* Citing *Leatherman*, the court held that the plaintiff's complaint—which cited his individual claim against the officer and further alleged that the officer's conduct was "in accordance with a widespread practice"—"was enough to satisfy the 'short and plain statement of the claim' requirement of Rule 8(a)(2)." *Id.* at 844. According to the court, the plaintiff "was not required to identify every other *or even one other individual* who had been arrested pursuant to a warrant obtained through

the complained-of process." *Id.* (citing *Jackson v. Marion County*, 66 F.3d 151, 152-53 (7th Cir. 1995)) (emphasis added).

Here, Plaintiffs have sufficiently pled a *Monell* claim at this point in the proceedings. As discussed above, the Amended Complaint [17] adequately alleges that Plaintiffs suffered a constitutional deprivation of their right to vote during the March 15, 2016 Illinois primary election. Plaintiffs further allege that such deprivations are part "of a broader trend of inconsistencies in 'official' results generated by Direct Recording Electronic Voting Systems, in this election and previous elections." Am. Compl. [17] ¶ 32. In Plaintiffs' view, Defendants conduct was "pervasive and widespread," and the result of the BOE's "*de facto* policy, practice, and procedure of willfully disregarding citizens' right to vote." *Id.* Under *White*, this is sufficient for the purposes of Rule 12(b)(6).

At summary judgment, of course, impropriety from a single incident may not give rise to a *Monell* claim. *See Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014) (stating that although the Seventh Circuit "has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice."). At this stage, however, Plaintiffs "need only *allege* a pattern or practice, not put forth the full panoply of evidence from which a reasonable factfinder could conclude such a pattern exists." *Barwicks*, 2016 WL 3418570, at *4. In other words, Plaintiffs "need only plead that the alleged incident is one of many" occurring in Chicago and "that a widespread practice" gave rise to those incidents. *Id.* at *5. Plaintiffs have done so.

16

Although Plaintiffs' claim, "like many § 1983 claims, may not have merit," this does not justify the "granting of a motion to dismiss in advance of giving [Plaintiffs] a chance to prove [their] allegations." *Hampton v. City of Chicago*, No. 96-cv-3480, 1997 WL 790590, at *5 (N.D. Ill. Dec. 17, 1997).

For the reasons stated above, Defendants' Motion to Dismiss [18] Count I is denied. The remaining objections raised in Defendants' motion are best addressed by a more developed record. Defendants argue, for example, that it was "impossible for any irregularities that occurred during the audit to affect the previously decided and announced election results." Defs.' Mot. Dismiss [18] 5. Defendants, however, neglect to develop the state law on this issue, and at this preliminary stage, the Court must generally confine its inquiry "to the factual allegations set forth within the four corners of the operative complaint." *Hakim v. Accenture United States Pension Plan*, 656 F. Supp. 2d 801, 809 (N.D. Ill. 2009).[1] The Court's ruling, of course, takes no position regarding the strength of Plaintiffs' cause of action. At present, it is enough to say that Plaintiffs have sufficiently pled a plausible claim for relief under § 1983.

### B. Count II: Violation of Right to Freedom of Association and to Petition the Government

Count II alleges that Defendants' infringed upon Plaintiffs' rights to freedom of association and to petition the government "in one or more of the following ways":

> a. Physically obstructing the Plaintiff Monitors from viewing the individual performing the tallies[;]

---

[1] For the same reasons, the Court must decline to rule on Scanlon's qualified immunity claim. *See* Defs.' Mot. Dismiss [18] 13-14.

b. Preventing the Plaintiff Monitors from photographing or otherwise documenting the results of the tally sheets[;]

c. [B]ending or obscuring . . .tally sheets in a manner to shield them from the Plaintiff Monitors' view[;]

d. Making hostile comments when the Plaintiff Monitors requested that they cease the foregoing activities and refusing to acknowledge or correct any of the aforementioned improprieties and discrepancies;

e. Deliberately misleading the Plaintiff Monitors [who] appeared at the April 5, 2016 BOE meeting . . . and preventing the Plaintiff Monitors from commenting prior to [certifying] the returns;

f. Swiftly bringing the certification of the results to a vote . . . without permitting the Plaintiff Monitors the opportunity to object to, or publically comment on, the procedures at the 5% "test counts" – despite the fact that they knew these Plaintiffs had attended the public meeting for this very purpose . . . ; and

g. Otherwise attempt[ing] to hinder or impede the Plaintiff Monitors' ability to monitor the 5% "test counts" as authorized by statute.

Am. Compl. [17] ¶ 48.

## 1. Count II Fails to State a Freedom of Association Claim

Count II fails to state a proper freedom of association claim against either Defendant. The Constitution "protects two distinct forms of free association." *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005). The first, freedom of *intimate* association, "protects the right 'to enter into and maintain certain intimate human relationships,'" *id.* (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 617-18 (1984)), including marriage, procreation, education of one's children, and

cohabitation with one's relatives. *Marshall v. Allen*, 984 F.2d 787, 799 (7th Cir. 1993). The freedom of intimate association "receives protection as a fundamental element of personal liberty, and as such is protected by the due process clauses." *Montgomery*, 410 F.3d at 937 (internal citations and quotations omitted). The second form of free association, freedom of *expressive* association, "arises from the First Amendment and ensures the right to associate for the purpose of engaging in activities protected by the First Amendment," *id*., including speech, assembly, exercise of religion, and the petition for redress of grievances. *Marshall*, 984 F.2d at 799.

Here, although Count II is clearly based solely upon expressive association, the Court fails to see how Defendants' purported conduct infringed upon that right. Of course, excessive government encroachments "can take a number of forms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The government may, for example, seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, *see Healy v. James*, 408 U.S. 169, 180-184 (1972); require disclosure of membership in a group seeking anonymity, *see Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 91-92 (1982); compel membership of one who significantly affects the group's ability to advocate its viewpoint, *see Christian Legal Soc'y. v. Walker*, 453 F.3d 853, 862 (7th Cir. 2006); or interfere with the internal organization or affairs of the group. *See Cousins v. Wigoda*, 419 U.S. 477, 487-88 (1975). No such actions, however, are alleged here, and the Court is unaware of any case that recognizes a similar freedom of

association claim based upon analogous facts. Indeed, from the face of the Amended Complaint, it is not even clear *with whom* Plaintiffs believe they were prevented from associating. Without more (and there is no more here), Plaintiffs' freedom of association claim fails to satisfy Rule 8's pleading standards.

### 2. Count II Fails to State a Petition the Government Claim

The First Amendment creates a right to petition the government—including state and local government—for a redress of grievances. *Ogurek v. Gabor*, 827 F.3d 567, 568 (7th Cir. 2016). This right "is cut from the same cloth" as the other guarantees of the First Amendment, *McDonald v. Smith*, 472 U.S. 479, 482 (1985), and thus, "is similar to the right of free speech." *Gray v. Lacke*, 885 F.2d 399, 412 (7th Cir. 1989). As a result, courts analyze an alleged violation of the petition clause "in the same manner as any other alleged violation of the right to engage in free speech." *Id.* (quoting *Phares v. Gustafsson*, 856 F.2d 1003, 1009 (7th Cir. 1988)).

In broad terms, Plaintiffs allege that Defendants infringed upon their right to petition the government: (1) during the testing process itself; and (2) during the April 5, 2016 BOE meeting. Am. Compl. [17] ¶ 48. Plaintiffs' allegations regarding the former do not support a claim. Plaintiffs specifically allege that BOE employees (including Scanlon): (1) physically obstructed the Plaintiff Monitors from viewing the Electronic Voting Systems audit; (2) prevented the Plaintiff Monitors from photographing or otherwise documenting the results of tally sheets; (3) bent or obscured tally sheets in a manner to shield them from the Plaintiff Monitors' view;

and (4) made hostile comments when the Plaintiff Monitors requested that BOE employees cease the foregoing activities. *Id.* The first three allegations do not describe "petitioning" activity; they merely relate to Plaintiffs' attempts to observe and document the testing process. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (stating that the First Amendment protects the freedom of *speech* and *expressive conduct*). The fourth allegation *does* assert petitioning activity, but it also acknowledges that BOE employees *received* Plaintiffs' complaints; Plaintiffs' objection stems from the employees' refusal to correct any of the discrepancies. As such, the asserted claim is without merit. Although the government "may not interfere with the right to petition," it "need not grant the petition, no matter how meritorious it is." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000).

Plaintiffs' allegations as they relate to the April 5, 2016 BOE meeting are also deficient. To the extent Plaintiffs sue Scanlon in his individual capacity, Plaintiffs make no allegation that Scanlon was personally involved in preventing the Plaintiff Monitors from speaking prior to the certification of election results. *See Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.") (emphasis in original). To the extent Plaintiffs sue Scanlon in his official capacity, such claims are redundant with Plaintiffs claim against the BOE. *See Schmidling v. City of Chicago*, 1 F.3d 494, 495 n.1 (7th Cir. 1993) ("A lawsuit against Mayor Daley in his official capacity is the same as a lawsuit against the City of Chicago."); *Williams v. City of Chicago*, No. 94-cv-3350,

21

1994 WL 594674, at *4 (N.D. Ill. Oct. 29, 1994) ("A suit against a local government official in his or her official capacity is redundant and unnecessary when the municipality is also being sued."). That claim, however, is also flawed, because the Amended Complaint is void of *any* assertion that the BOE's suppression of public comment constituted a widespread practice rather than an isolated occurrence. Under *Monell*, this is not enough. *See Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014).

In sum, the above pleading defects, considered collectively, require dismissal of Count II. As it relates to both Defendants, Count II does not allege a cognizable freedom of association claim, nor a government petition claim for Defendants' actions during the testing process. As to Plaintiffs' allegations regarding the April 5, 2016 BOE meeting, Count II likewise fails to allege personal involvement by Scanlon, or a widespread practice by the Chicago BOE. Accordingly, Defendants' Motion to Dismiss [18] Count II is granted.

### C. Count III: Declaratory Judgment and Injunctive Relief

Apart from claiming that Count III depends upon the survival of Counts I and II, Defendants make no other argument as to why Count III should be dismissed. Because Count I remains, Defendants' Motion to Dismiss [18] Count III is denied.

**IV.    Conclusion**

For the reasons discussed above, Defendants' Motion to Dismiss [18] is granted as to Count II and denied as to Counts I and III.

Date: April 3, 2017

Entered:

John Robert Blakey
United States District Judge